Ruffin C. J.
The premises lie in Cherokee County, and contain 140 acres. The lessor, of the plaintiff claims title in the following manner: The General Assembly of 1848 passed a Resolution, which was ratified on the 26th of January 1849, in these words: 1. “Resolved, that the Secretary of State be, and be is hereby authorised and required to issue to Ailsey Medlin, for the services of her father, Benjamin Schoolfield, iu the continental line of the State in, the war of the Revolution, or her heirs or assignee, a grant or grants, for a quantity of land not exceeding 640 acres' to be located in one body, or in quarter sections of not less-than 160 acres, on any of the lands of this State, now subject to entry by law; said grant or grants to be issued on the application of the said Ailsey Medlin, her heirs, or assignee, as she or they may prefer, in one or four grants : 2. That the said warrant or warrants shall or may be lai 1, so as to include any lands now belonging to the State, for . which the State is not bound for title: provided, that this *314 acti does- not extend to any of the swamp lande-of this State.”" On the 25th. of September 1849 a grant for the premises was issued to-the lessor of the plain tiff) wherein, is recited, the above resolution in favor of-Afilsey Mledlin, and that Sianmi-re is-her assignee,, and the land is described.-as dying; in Cherokee County, by metes and bounds,, set forth inthe-patent and in the plat annexed thereto,, and. the quantity-stated to* be 640 acres.
The defendants admitted themselves into- possession ot 400- aeres,- part of the land-granted to-the lessor of the plain-dfF, and they claimed title thereto as-follows : lit is tracf No. 1-1', in district 6, of the Cherokee lands,, surveyed for the State for sale on the 29th. of May i837, and was pur: chased from the Commissioners, Samuel F. Patterson and: Charles L. Hinton,-at the sales of the Cherokee lands on the-2nd of November 1838, at the price of eight thousand dollars, by the defendant John At, Powell; who then paid one-thousand dollars- of the purchase money, and gave his b ond? for the residue, according, to the Statute. He took from: the Commissioners a certificate of his purchase,- endorsed on the survey, describing, the land,, and in 1841 he paid into> •fhe treasury the sum of $400,. in past of his. bonds. Immediately on his purchase he entered into-possession of the land, -and he, and the other defendants under him, have been -in.possession of that parish, ever since,, claiming it- under the purchase. By consent a verdict was taken for-the plaintiff,', subject to the opinion of the Court on the foregoing facts.. Afterwards, his Honor being.of opinion .with the defendants,, set the verdict aside, and,- according-fo the agreement, gave .judgment-of nonsuit, but allowed, the plaintiff an appeaL.
No counsel on either side.
Humir, C. J. The question is, as- to the validity of the-.grant to the lessor of the plaintiff It is settled in this •Slate, that a .grant, founded on an entry made, where vacant *315 land is subject to appropriation, by entry, cannot be collaterally impeached for defects in the entry or irregularity in any preliminary proceeding. But a distinction is equally well established, that, when the law forbids the entry of the-vacant land, in a,particular tract of country, a grant for apart of such land is absolutely void ;■ and that may be shown in ejectment. Thus, entries within the Cherokee boundary were forbidden by the acts of 1778 and 178S, and, consequently, the grants were held to be void. Avery v. Strother Conf. Rep. 434. Strother v. Cathey, 1 Murp. 102. So, the confiscated lands were grantable only on sales by the commissioners, certified to the officers of State;, and, therefore, an entry and grant thereof was held void in a-.suit for the land. University v. Sawyer, 2 Hay. 98. In these instances,, the subjects, if ®ne may so speak, were not Within the jurisdiction or capacity of the executive officers who were held to have transcended their powers in'issuing the grants As the entry laws were never extended to the1 lands m Cherokee, butt, by the acts of 1783, 1819, and 1836,. .the entry of those lands was forbidden, and other modes-provided for the disposition of them by public sales by ■.commissioners-, the counsel for the plaintiff admitted,, that •this grant would be void by the general law, and relied on the resolution of 1848,. as the- authority for the location in-Cherokee, and!,. therefore, as sustaining the grant, in this-proceeding. The resolution is considered to>have created an exception, from, the general law in favor of this claim.. Such an exception is an unusual! thing, and not readily to be expected;, and therefoi'e it ought t© appear very closely,, by unequivocal and express language,, or strong inference. If it was intended to create this single exception, it is singular, that the Cherokee lands should not have been expressly mentioned in. the resolution. But they were not; and it is only from general, terms,, and by implication,. the attempt is made to include them : an implica *316 tion, which, at the best, is uncertain and unsatisfactory. It is clear, they are excluded by the terms of the first clause of the resolution, which expressly provides the location, “ on any of the lands of this State, now subject to entry by law,” and shows the actual intention to affirm the general law, respecting these lands, almost as clearly, as if it had been said in so many words, that it should not cover any part of the Cherokee territory. Against such explicit terms in the resolution, it is requisite the subsequent language should be very strong and positive. It is said, however, that the second branch of the resolution is sufficient to open to this claim, all the land of the State, including that in Cherokee, because it allows the location “to include any lands now belonging to the State, for which the State is not bound for title,” with a proviso that if shall not expend to the swamp lands. It is obvious, that tlie construction contended for makes the two clauses of the resolution directly contradictory. That is never admissible, if it can be avoided; but it is our duty, if possible, to reconcile the different parts with each other: which may be done, in this instance, by construing the latter clause, in reference to the first, to mean “ any such lands;” that is, lands to which the entry laws had been extended, wheresoever situated, which the State was not already bound to convey. That would allow some operation to both parts of the resolution ; while the other view makes one part of the resolution repeal another, though the passage of both is but one act. It was, however, further contended that the construe-, tion, claimed for the plaintiff, is fortified by the proviso, excluding the swamp lands from the operation of the resolution: since it implies, that the swamp lands were considered to be within the terms of donation, and hence it became necessary to exclude them expressly; and, if they were within those terms, so also must the Cherokee lands be. The argument is a fair one, when the thing excepted *317 by a proviso might reasonably be supposed to be within the words of the enacting part of the legislative act; and it may have much force, when the enactments are in themselves dubio&s. But it cannot avail much, if anything, when it is certain, that the enactment wmuld not of itself have embraced the thing excepted, and it is thence apparent, that the proviso was superfluous, and inefficient. In such a case, the proviso may perplex, but it cannot elucidate. It is obvious, upon reading this resolution, that, like most private matters in the legislature, this was not well understood by the draftsman, nor much considered by the members at large. The state of the law respecting the swamp lands was not duly looked into ; for, if it had been, it would have been seen, that, by the act of 1836, the whole of the swamp lands has been vested in the President and Directors of the literary fund, with the power and duty to drain, sell, and convey them for the best price that could be had, as a part of a trust fund for the establishment of common schools; and, therefore, that those lands did not belong to the State, in the sepse of being hers, without any obligation on her for the title. The proviso, then, seems to serve but little purpose in arriving at the true sense of the resolution, and leaves k -to the considerations already adduced. There are, however, others which tend to raise an implication against the interpretation urged for the plaintiff. By the general law, vacant lands are to be entered with the entry taker of the eounty where they lie, and a warrant is to be issued by him to the county surveyor, and he is to make a survey, and plat, and return them to the Secretary of State- within a prescribed period. Those are sworn, and responsible officers, and are required thus to act, as the means of preventing frauds on the State, by truly ascertaining the land, which ought to be granted. It should not be supposed, that the Legislature meant to dispense with those safeguards against imposition; or that, in this instance, *318 the land to be granted should not be identified by sworn officers on the spot, for the guidance of the officers at the seat of government. Yet, that wouM be so, if the resolution extended to land in Cherokee; for, as the entry laws never extended to that county, there could be neither an entry taker, nor surveyor; qualified to discharge the duties-belonging to those officers in other counties. The grant does not specify by what authority, the person, who made-the surrey, did so; and it was not easy to conjecture, upon* what the Secretary proceeded in granting the particular land- Upon enquiry at the office, the information was obtained, that an entry was made with the clerk of the County Court, and a warrant issued by him, to a surveyor, who made ■the plat, and then a certificate, given by the State’s agent for Cherokee bonds, that the State was not bound for title, for any part of’ the land included íes the survey : a point,, in which it seems that gentlemen was mistaken. But the provision in the statute, for the clerk’s acting as entry taker, certainly would not create for him the office of entry taker pro hoc vine merely, as the act has, plainly, within its puiview, a vacancy in a pre-existing office of entry taker, and intended merely to provide for entries made with him, until the vacancy should be filled, which is directed by the act to be done at the next term of the County Court, after the vacancy. Now, although the first part oí the resolution merely authorises the Secretary of State to issue a grant to Ailsey Medlin, and is silent as to the mode of selecting, and certifying the particular tract, yet, it seems certain, that it was intended those facts should appear in the usual modes of entry, warrant, and survey. For, the se - cond branch of the resolution clearly denotes that, by saying, that the warrant or warrants may be laid, &c.” That could not be in Cherokee, and thus evinces that, probably, the grant was not intended to be for land in Cherokee.
If, however, that should not be the correct construction of the resolution; and it is, perhaps, proper to say, that,. *319 framed as it is, oneeannof fee certain of it.; .yet the Court is agreed, that the land, claimed fey the defendants, was not the subject of grant under the resolution, and that the grant must be held to fee null in this action. The reason, why grants for land, taken up as vacant, within the counties.to which the entry laws extend, cannot be impeached collaterally, is that there is a general authority in the public officers to issue such grants; and they are, therefore, to be taken, as having been rightly issued, unless that matter be directly put in issue, in a proceeding to impeach them-But, it has already been mentioned, that it is otherwise in respect to land, over which the entry laws do not extend, or in respect to which, though belonging to the State, and within an entry county, some other particular mode of disposition is provided; because, in these cases, there is either total want of power, or an excess of it, in regard to the subject matter. The present seems to the Court, to fall within the latter class of cases, even if it be admitted, that land in Cherokee might have been taken under the resolution. For, supposing that the resolution had expressly said, that the claim might be located on any land in Cherokee, for which the State was not bound for title, it could not have been construed, as a provision in a general statute would be, which opened all vacant lands in Cherokee to entry, by any citizen. On the contrary, it must be regarded as making a special gift of particular land, or of land in a specified condition, and construed as exceptions from general rules usually are ; that is, strictly, or, at all events, fairly, towards the State and previous claimants under her. It is known, that the lands in Cherokee are in various states. Much, not fit for cultivation, was not surveyed tor sale. Some, which was surveyed, was put up at the sales, but not sold for want of bidders. Much was sold, and of that some has been surrendered by the purchasers, or their sureties, and accepted by the State; and *320 some, including that now in controversy, is still held, and claimed under the purchasers. It could not have been the purpose of the Legislature to give to this person, land which she had before sold to another of her citizens, for a high price, paid or secured. The bounty, then, must not be taken to be of so much Cherokee land generally, but to-be made in very special terms, confining the right to such portions of those lands, if included at all, as the State was not previously bound by her contract, and her honor, to convey to any other person; and, therefore, it is incumbent on the donee to show that his grant is for land within the particular description, or, at all events,it is fatal to it, when it appears, that the land is not of that particular description, but had been purchased, and that the State was justly bound to the purchaser for it.
Per Cukiam. Judgment affirmed.